Case No. 242777, Sabby Volatility Warrant Master Fund v. Jupiter Wellness, Inc. Mr. Fleming. Good morning. Thomas Fleming for the appellant, Sabby Volatility. We're here appealing the district court's order dismissing each of the four counts of the amended complaint. The case presents what I submit is a rare situation where a corporation sets a record date, declares a dividend, publicly announces both of these events, and then issues the dividend to the wrong shareholders, meaning non-record date shareholders. The complaint alleges that Jupiter Wellness made at least 10 separate public announcements of the record date and the dividend being declared, many of which came after the record date. Sabby held shares on the record date. You say it's an unusual situation because they don't normally announce separately the record date and the distribution date or because they don't normally miss the record date that they've announced? I have not seen a case, Your Honor, where somebody misses distributing it to record date holders. And I think if you – there are literally thousands of dividend-bearing securities trade and they invariably are accompanied by public announcements of a record date and dividend date and they invariably are delivered to the record date holders regardless of any sale of shares. I take it that we have to take for purposes of this proceeding as true what, after all, they said, which is that they had set the record date. Correct, Your Honor. I mean, you're relying on a press release, but the press release is theirs. It's their statement as to what they did. Until there's discovery, I suppose we don't know whether that was an inaccurate statement in the press release. That's precisely correct, Your Honor. We believe that they did indeed set that record date. The district court does, and my colleague also argues that the record date was changed. That is simply not in the amended complaint, and we don't believe that ever happened. Well, whether it was changed or whether it was wrong in the first place, that they just intended to set it. I mean, we don't know. We have no board resolutions or anything like that, but we wouldn't at this stage. This is the allegation in the complaint. Correct, Your Honor. So for the purposes of the district court says even if they set a record date of July 7th, you still don't have standing to sue for breach of contract. Correct, Your Honor. That's the essence of the district court's holding. What the district court uses the term standing in the sense of privity because the district court concluded that by selling the shares, any rights to the dividend transferred to the acquirer. Right. This is not an Article III standing case. Precisely, Your Honor. Standing is used, as I say, in the sense of privity. First of all, there's two problems with district court ruling. One is, it's just simply— Is that different from a regular standing? So if they say the rights travel with the shares, it means that you weren't entitled. You're not the counterparty to the contract, and so you wouldn't have been injured. And so maybe that is also a standing question. But I think for Article III purposes, we sufficiently alleged injury here because we bought the shares. Right. And I think we would survive Article III standing at the pleading stage. You might review it again later at summary judgment.  But mostly this is a causation question, or is there a proper cause of action in contract? Correct, Your Honor. And the Delaware cases are clear, and we've cited them, and I think the district court just simply got it wrong. A record date holder is entitled to the dividend. We cited one of the leading treatises that says, any dividend already declared when shares are transferred alone— Can I just ask you, this argument that you're making regarding having standing or having a cause of action, however you want to characterize it, based on what I'll call your dividend argument, where is that alleged in your complaint? Because as your complaint, it reads as this is a breach of contract. And so if that is your claim, that's, I think, where the issue of, well, you weren't a shareholder at the time this happened, and so how do you have standing or the ability to raise this? Well, we were a record holder at the time the dividend was announced, and we were a record holder on the record date. And what the Delaware cases— Right, but I guess I'm asking more specifically this argument about the nature of the type of dividend that was declared, that your rights flow from this, and that that's the basis of your argument here, where is that in the complaint? Because the complaint is framed as this is a violation of the bylaws. This is a breach of contract. It's what you're raising now about the dividends. I'm struggling to see where that is in the complaint. Well, I believe it's squarely stated in the breach of contract claim because the breach of contract count is a claim to money damages arising from the failure to deliver the dividend to a record date holder, which is what we believe Delaware law requires. David, that would be a legal theory, and you don't need to plead a legal theory, right? I agree, Your Honor. So the facts in the complaint say that you were a shareholder as of the record date, and they did not deliver shares. You allege the record date was July 7th. You were a shareholder on July 7th, and you did not get the spinoff shares. Correct, Your Honor. They delivered them to non-record date. The question is whether those facts fit a legal theory. Correct, Your Honor. And I submit that Delaware law is clear that a record holder has a direct right to the shares, a debtor-creditor relationship is established. The Delaware courts, I mean, you do talk about it as terms of a breach of the bylaws, but the Delaware courts do say it's not just the bylaws that's the contract. It's the announcement of the distribution, right? Correct, Your Honor. The bylaws crystallize the right, and it's the bylaws plus the announcement that give the contract right. But even if you look at the district court's view that this somehow transfers, even that leads to the same result because the bylaws, like every bylaw, has a record date cutoff provision, which provides that the record date, once a record date is set, anybody who acquires shares after the record date doesn't acquire the dividend or the right to vote. Yes, it would be peculiar, wouldn't it? What would the record date mean? If the rights to get the dividend as of the record date transfer with the shares, that wouldn't make any sense. There would be no point in having a record date. Correct, Your Honor. Essentially, it makes the record date a hollow promise, an empty promise that gives the shareholders nothing. And, in fact, the whole reasoning is circular because the district court says, well, the person who has it on the distribution date gets it, but if there's no distribution, then nobody ever gets it. And in this case, they went to other shareholders. Or even more to the point, like if they do a distribution only to some of the shareholders and not to others, if nobody could enforce the claim, then they could be kind of arbitrary in how they distribute the shares. That is also correct, Your Honor. So you don't deny that, as a general matter, the right to sue for breach of the bylaws travel with the shares. You generally are a shareholder. It's like you're talking about the corporation not abiding by the bylaws on an ongoing basis. But this is a case in which, because of the creditor and debtor relationship that's established on the record date, there's a right that vests that's personal to whoever is the shareholder on the record date. Precisely, and that's reinforced by the cutoff language in the bylaw, which specifically tells the purchaser that you're not getting this right. You're buying after the record date, so therefore you can't get it. And that's not just dividends, but it's also voting. Would it be incoherent for the rights to travel with the shares? I mean, I suppose whoever succeeds to the shares, I mean, I guess this would be hard to administer, but they could argue that the previous shareholder didn't get the spinoff shares, so you should give them to me or something like that. Well, it would be impossible to administer also because the same provision applies to voting. So you set a record date for dividends and voting. That's what the clause contemplates. And in which case no one would know who's voting at an annual meeting. It would be impossible to administer. So that's why you have a record date, so you know who gets it, and it's set aside at that date and time on the records of the company and the appropriate shareholder who gets it. Can I ask just as a – I mean, I guess this is not really for us to decide because this would be, you know, for further proceedings, but if you do get your receipt on a breach of contract claim, do you think that you can – you recover the value of the spinoff shares that you did not receive, or can you also get damages for the losses associated with the short sale? Well, the short sale is a totally separate point, which I haven't gotten to yet. I only have a few seconds left. But the damages for the failure to deliver the SRM shares, the dividend shares, that's basic law that you get the value of the shares at the time they fail. Right, because that's when you're contractually entitled to. Right. But you don't think that because of the contract, you were entitled to rely on that promise and do a short sale, and therefore then messing up the short sale causes damages? The fourth count deals with the short sale. That sounds solely in negligence, and it's a straight-up duty of care. The company has a duty of care in all of its business dealings. It can't sell defective products. It can't do all sorts of things. I'm not sure I understand this, though. The allegation is they just made a mistake? Correct, Your Honor. As opposed to they decided in breach of their promise to change it. Well, they didn't. No, they never changed the record date. How do we know that? Well, that's what the complaint alleges, and that's what they've told us over and over again, so that's what I'm going with. But what we allege in the complaint is that the paperwork that was necessary to fix the record date, they failed to exercise care in filing that. And they have a duty, what, to the whole stock trading public? Well, I think there's a very limited number of people who would be hurt by this, and it's really the only people I can think of would be the handful of people who had short positions, because what happened here is once they issued this stock dividend. Well, if they get by with a duty of care just to the limited universe of people who want short positions, it would have to be a duty of care to the whole purchasing public, right? Well, it's a duty of care not to cause injury to people. That's generally what the duty of care involves. Well, but why is it? I mean, you made a bet, right? I mean, if you had thought the shares would go in a different direction, or if they did go in a different direction, you wouldn't have suffered anything. Well, had they issued to the record date holders, we wouldn't have suffered anything. So what happened is they issued them to holders on August 14, so my client woke up one morning and found a $350,000 liability in its account. So it didn't do anything except follow carefully what was going on in the company's public announcements, and then it woke up in the morning and found it owed $350,000 for no reason. So the point is not that you lost money by taking a short position that didn't work out. It's that you took a short position that would have been covered had the stock dividend issued. Had the stock dividend issued, we wouldn't have ended up with, on the record date, and had they exercised due care in conducting their corporate affairs, we wouldn't have had any short shares because we were not a short holder on the record date. On the record date, right. So you said you took a short position in reliance on the record date being July 7th. That was part of our, yes. But it turned out the record date was not July 7th. And they gave no notice. So you had a liability that wasn't expected. My client woke up in the morning and found it owed $350,000. Doesn't that show that actually whenever there's a big gap between the record date and the distribution date, it would always be kind of a sure bet to take a short position because if you're spinning off value from the parent company, there's going to be a reduction in value? I'm not an investor judge, but typically everybody in the market has figured this stuff out, and the price reflects what people are expecting. And so I don't know if there's any sure bet. I might expect that if you move back the distribution date, the record date also would naturally move back. That might not be an issue for your claims, but it just looks like that might be an expectation. That generally is not what happens because once the record date is fixed, Delaware law says you can't rescind it. And people usually take great caution in making sure that they actually have the cash or the securities when they set the record date and announce it. And that's why there's such tremendous reliance in the marketplace on press releases announcing record dates. And is there still tremendous reliance, though, when the bylaws contemplate that the distribution date can, in fact, be changed or delayed or might not occur? How does that? I mean, that's a risk that the company announced that the distribution date might be delayed, and that's, in fact, what happened. Right, but no, I'm saying from your point of view in terms of reliance, is the reliance reasonable when the announcement specifically notes the uncertainty about the distribution date? I respectfully submit it is reasonable because, A, we pled that, but also the company wouldn't have announced and declared a dividend unless the company had a high degree of confidence that it could deliver on this. But what would they have to say? Like, if they're saying here's the record date, the distribution date could be changed, it might not happen, it might be X, Y, Z, there's clearly uncertainty about the distribution date. So from your point of view, what would they have to say for there not to be? The appropriate thing for a corporation to say in that setting would be, we intend to declare a distribution and a record date in the future, and these are our corporate plans. And then when the corporate plans are sufficiently firm, that's when they announce a record date and declare a dividend. Right, but here they set a record date. At least that's what they said they did. Correct. But they did say the transaction might never happen. I think these raise issues of fact, Your Honor. Well, why is that an issue of fact? I mean, that's what they said, right? That's the disclosure, that's the caution, is that maybe this will never happen. So in that case, doesn't that have some impact on your ability to rely on this is going to happen? Because I take it it's not just the setting of a record date. The setting of a record date, this is not a normal distribution that just says this year's dividends are this, and the record date is anybody who held the shares as of X is going to get it. There's a transaction that is going to result in a stock dividend or a stock spinoff or whatever we want to call it. And if it happens, the record date has been set as this. But you're taking the risk still of it's never happening. Now, that's not the risk that exactly eventuated, but it's still a little hard for me to see how it's reasonable to rely on this is going to happen. When you're told, it might not. Well, the company had the shares of stock, of SRM, so they could have always dividended those. They could have, but maybe I'm mistaken. Wasn't the spinoff and the distribution contingent on the transaction happening? Well, they were trying to raise capital, which obviously they believed they could at the time they declared the dividend. And that's why they made the announcement. But they made a specific – the point is – I guess what I'm looking to is the reasonableness of reliance. Now, maybe that only goes to the negligent misrepresentation claim or something and not to this – Well, the contract claim doesn't count on reasonableness of reliance. It counts on contract. No, I'm not talking about the contract claim. You've got four claims here. Correct, Your Honor. I'm thinking about the promissory estoppel claim, which depends on reasonable reliance, and the negligent misrepresentation claim, which relies on justifiable reliance. Right. So I think both of them would ultimately become a question of fact of whether or not the reliance was reasonable. And my client would submit that it is because that's what they were told by the company. I would think that it's not reasonable as a matter of law because when there is this language saying that these – this depends on contingent future results, you can't reasonably rely on that. I guess your argument would be, well, they say the transaction might never occur, and the distribution is only expected to occur and might not occur. But if the distribution does occur, there does seem to be a definite record date. And you brought the pairs and reliance on the idea that given that the distribution is occurring, it's going to be a record date of July 7th. And also that I brought in reliance on the fact that they had, in fact, previously declared a record date and declared a dividend. What do you mean by previously? I mean, we are talking about in the press releases, right? Well, there's a press release on June 27th, which actually makes the announcement, and then that's repeated after the record date on multiple occasions. So we're also dealing with statements that occur. What about the general disclaimers in the press release? So the June 27th one says, this press release does not constitute an offer to sell or a solicitation offer. There's all of this language that disclaims the idea that you should be relying on the press release. And I submit that that applies to the prospective nature of it, but the fact is that they had declared a dividend and set a record date, and that's what we were relying on. And that should be sufficient for promissory estoppel purposes, certainly at the pleading stage. Okay. So if, in fact, you claim that you were relying on the distribution date, you would acknowledge that that claim would fail because they had a critical language about when the distribution would occur. It's just because they seem definite about the record date that you think the reliance is reasonable. We had, I don't think we plead any claim in reliance on the distribution date. That's why it's a hypothetical. If I counted on getting... The critical language and the disclaimers you think apply to the distribution date, but not to the record date. If my claim was relying on getting the shares on the anticipated distribution date, I don't think that would be reasonable in light of these statements. But what would be reasonable is relying on the fact that they actually had a meeting, declared a dividend, had the shares, and record date holders were going to receive them. When is the short... When was the, I'm not sure what you call it, the effective date of the short, right? Some date you're going to have to put up. So if they never... What would happen if the distribution date got adjourned past the time when you needed to cover the short? Well, what happened is the actual distribution was on August 14th. So because they hadn't notified their transfer agent and the street and done whatever, when they came time to distribute the shares, they just distributed them to whoever had them on that date. So that was August 14th. My client had a short position on that date. So on the morning of August 14th, it woke up and found that it owed $350,000. But you still had the risk that at some point, if the distribution never occurred, or if the distribution was adjourned to some point that was beyond the date of your short position, you still were in trouble. I don't believe so, Your Honor, because the distribution should have gone to record date holders. But what if there was no distribution or if the distribution was delayed? You're saying you would just keep having a short position indefinitely. That wouldn't affect my client's short position. What happened is because they issued shares long, 2 million SRM shares, anybody who was short had to get a short SRM share. So my client was short the stock. And so in order to create a parallel world within the depository trust, they ended up with a $350,000 IOU. Correct. But you just thought it was going to be based on the record date. Correct, and that's what should have happened. So it was no longer a possibility that the distribution was not going to happen at all. Well, it didn't affect our short position. If there was no distribution, we wouldn't have been affected in the short position at all. We were short. It would be less likely to, you know, be profitable, maybe. Perhaps. I don't really know what their trading strategies are. But had the short happened, had the shares been distributed to record date holders, whenever our short position was, as long as it was posted. We wouldn't have had this extra liability. Right. And had there been no distribution, we wouldn't have gotten the liability. We woke up with an IOU for $350,000 out of the blue because the company hadn't filed some paperwork. And it's a straight up claim for breach of duty of care. I see I've gone over my time. Well, you took your time for rebuttal. So we'll hear from you again. Thank you. Let's turn to the appellee, Ms. Parks. Thank you. Thank you, Your Honor. Carrie Parks. May it please the Court. I represent Jupiter Appellee, obviously, since I was sitting in that chair. I think I have four main points after hearing Your Honor's colloquy with Mr. Fleming. The first is that Sabi's standing arguments sort of conflate the 12b-1 and the 12b-6 issues, which are separate issues. Right. So Delaware law is crystal clear, whether we agree with it or not as a policy matter, but the state of Delaware is very clear that somebody can only sue for breach of corporate bylaws and can only sue to collect a dividend if that person currently owns the stock. As a policy matter, I have no opinion here. I mean, that's not – I don't think that the Delaware law is crystal clear about that. I mean, it is generally true that – I mean, as Mr. Fleming acknowledged, that for ongoing violations of the bylaws, maybe you need to be a shareholder. But Delaware courts say the declaration of a lawful dividend has long been understood to give stockholders, as of the record date, standing as predators to sue at law for the recovery of the amount due. Right. That's the Sutton States case. And then Delaware transfer court also says the right to receive payment of a lawfully declared dividend is a separate property right – or is a separate property right of the record stockholders, and it's not a right in the security. Yes. So is it true that if – you know, if I – I mean, just as a matter of logic, if I announce that I'm going to give all the record date shareholders, you know, a property benefit, I have a contract with them. Yes, Your Honor. I think it's really separated in two parts, right? It's that classic 12b-1 versus the 12b-6. I'm not sure what the point is. I would tend to think this is a 12b-6 issue, that it is basically about whether there is a cause of action under Delaware law in these circumstances. But either way, at this stage of the proceedings, we're going by what's alleged in the complaint. Now, maybe if it were a 12b-1 issue, then the court could say, okay, well, let's just settle it. Let's have discovery on this issue and find the actual facts and make a judgment about whether there is constitutional standing. But none of that happened. This wasn't decided on the basis of the pleadings. So I'm not sure it matters that much to Mr. Fleming's argument, which it is. What am I mistaken about, if anything, there? Well, I'll touch on the 12b-1 very briefly, but I'll focus more on the 12b-6, because I think, frankly, it's a much more interesting question and one that would also win out. But I will point out that Sun States is an unpublished case. The way that they use the word standing there is a little fuzzy. And I would point, Your Honors, to a Delaware Chancery case from 2015 that we referred to in our brief, which is the In Re Act Division shareholder litigation. And that one I did quote it out. In that one, the Chancery court explicitly says that when a share of, quote, when a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from classic examples, including the right to compel a payment for contractually specified dividend, travel with those shares. Okay. So let's say there is a record date of July 7th. Mm-hmm. And, in fact, they do a distribution not based on that record date. Sure. Or they don't give it to everybody who had shares on July 7th. But somebody sold their shares after July 7th. So they thought that they were entitled to the dividend. So who gets to sue for breach of contract? Well, it would be weird, right? In this case, somebody else got those dividends, right? No, they didn't. Well, sorry. Exactly. Whoever the shareholder was and whether it's the right date or the wrong date. But that might happen. I might have a contract with you. I give you a payment, and I'm entitled to receive something from you, and you give it to somebody else. That doesn't mean, well, I give it to somebody so there isn't a breach of a contract, right? Yes, Your Honor. And I think this is where I'm pivoting the focus of our 12 v. 6 argument on this dividend issue is that Delaware law recognizes three different types of dividends. And it's annoying as lawyers because words matter a lot, right, but they have to keep using the word dividend over and over. But Delaware law specifically distinguishes between cash and property dividends on the one side and capital stock of the corporation on the other side. And so what Delaware law says, and actually I'll add to that, the relevant Delaware statute specifically defines what is a dividend as money that a corporation sets aside out of its surplus or profits, right? And we've hopefully received those in our various investment accounts. But the reason why, and sorry, to close that loop, when a corporation announces that it made some profit, it's going to pay out its profits to its shareholders, that is a binding promise. And, Your Honor, frankly, as a policy matter and someone with a 401k, I agree with you that I would want that cash to be set aside for me in reliance on that day. However, Delaware is very clear that that last type, the type that shares of the parent corporation itself, does not create that promise. Right, but this is not that, right? So Delaware courts say a stock dividend takes nothing from the property of the corporation and adds nothing to the interest of the stockholders. It does not distribute property to the stockholders. It merely changes the form of their investment by increasing the number of their shares, thereby diminishing the value of each share and leaving the aggregate value of their stock in the corporation the same. This is not that because here the parent company is divesting itself of the subsidiary. And so giving away property that the parent company used to own, which is the ownership of the subsidiary, which is now being spun off into something separately. So, Your Honor, I think actually that difference is huge, right, because we're really thinking about in corporate terms it's the difference between an asset sale and an entity sale, really. Right, because in July 2023, Jupiter Wellness, as an entity, includes all of SRM as an entity, right? So if we play it, let's say, just for simplicity's sake, that on July 1st, Jupiter, which includes all of its subsidiaries, trades at $1 a share. By basic economic theory, part two, right, assume that SRM is worth 20% of Jupiter as an entity, right? That means that the day that SRM is spun out of Jupiter, theoretically, Jupiter should now be worth $0.80 a share, SRM should be worth $0.20 a share. And so what matters here is that, again, it's that idea that the stockholder really owns the same thing that it did before, but it's shaped differently. It's not the same value, but it doesn't own the same thing, right? Yes. It used to have shares of Jupiter, and now it has shares of Jupiter and SRM, right? Exactly. So you recognize, let's say, if it's a property dividend, you recognize that that is a contract that's personal to the record date shareholder? Yes, John. Okay, so if Jupiter were to say, we have a factory in Pensacola, and we're going to shut it down, instead of sort of selling it and distributing cash, we're just going to give everybody pieces of it, so every shareholder gets like, you know, a doorknob or whatever from us liquidating the factory. If they, like, give off their assets to the shareholders, that's a property dividend, right? No, I don't think it is, Your Honor. And I think the analogy that I've thought of, let's take your factory analogy, right? When we think of what is a dividend under Delaware law, as far as that classic— What is a property dividend? The property dividend is also considered surplus under the Delaware statutes, right? So in your factory— So you're saying if the company just distributes its property to shareholders, that's not a property dividend? I think it would depend how—Your Honor, my time is expired. It's not up, actually, but— Oh, I see. It's the yellow. Okay. Thank you, Your Honor. Too much law school beatin' in my head, I guess, about pausing at the yellow light. So, Your Honor, I think it's that idea of surplus and how the company structures its surplus, right? So to take your example, in the factory—I forget, I'm sorry, if you specified a type of factory. Let's say it's a car factory, right? In that example, the cars are different from the thing that makes the cars, right? And so what we see in the treatises of Loss and Graham and those classic, you know, the securities rag volumes that are this large, as well as the distinctions that are drawn in the case law that we refer to in that Delaware statute, that what Delaware says is that there's a real difference between the stuff that makes whatever the profits are versus the profits itself. I was gardening this weekend, so I thought of it as the difference between if you plant an apple tree, the apples would count as that cash or surplus, as opposed to if you took a branch off the apple tree, you grafted it onto something else. That's the tree itself, and it's going to be able to produce that income, hopefully, if you did it right. Hopefully, it'll be able to produce that income later. Here, this idea of a spinoff is really the same thing, in that, you know, Jupiter had this— Okay. But, like, if the company just liquidates itself and distributes its assets to shareholders, you're saying that's not really a contract. It doesn't really—like, it's the same as if the company just continued in existence and nobody has any kind of entitlement to receive the property. Well, not exactly, Your Honor, but actually the two DuPont cases that Savvy references in its case are somewhat relevant to that, though we don't think they stand for the proposition they were offered. They're relevant, and these are DuPont cases from, like, the 1960s, going down the rabbit hole there. The A. Mr. DuPont at some point had also been the director of General Motors, and in the 1910s had caused— I mean, I don't know if I need to know the history of the DuPont Corporation. I'm just—let's just get back to the facts here. Like, taking the allegations of the complaint as true. Sure. Let's say the record date is July 7th, right? You agree that that means that somebody who's a shareholder on the record date would be entitled to the spinoff shares, right? If that's what they allege, but they don't allege contracts. I mean, you're going to take that for granted for purposes of my hypothetical. Okay. And, in fact, when the company does the spinoff transaction, they give it to a different set of record—of shareholders, not all the record date shareholders. Okay. But somebody who was a record date shareholder who would otherwise be entitled to it subsequently sold his shares. So who gets to sue the company for breaching the agreement to distribute the spinoff shares to the record date shareholders? Well, under Delaware law, nobody because it's not considered to be a binding contract because it's a spinoff, right? And to cap—we don't need to do that. But you're saying that Jupiter, when they do the spinoff, they could have said, all right, we're going to declare a record date and we're going to declare a distribution date, but we will give all of the spinoff shares to, like, our favorite shareholder and nobody else, and no one would get to sue over that? Well, I think that would be a very different claim, right? It would be a stockholder— Why would it be different? You're saying nobody gets to sue because it's not a binding promise, so they could do whatever they want. Well, no, because you'd have different cause of action, right, like a breach of fiduciary duty, maybe some kind of squeeze-out, some other sort of claim that stockholders of the entity could bring, perhaps, as a derivative action in your example. Now, to sum the DuPont really quickly, the point was, in those cases, the Court decided that the dividend, what had been called the dividend of GM shares, was not actually a true dividend, but instead a return of capital to investors. And that was the short version of why I think DuPont mattered to your question, Your Honor. So I think, you know, to sort of touch on and explain further why that distinction— Oh, I'm sorry, Your Honor. I think I went over time. Wait, just to clarify. Yes. So you're saying they announced the record date. They don't give the shares to the record date shareholders. Somebody is no longer a record date shareholder but didn't receive their part of the bargain. You're saying enforcement of that promise is left to the existing shareholders to just kind of police the fiduciary duties or something of the corporation. No. No, Your Honor. I'm saying it's actually not a binding contractual promise at all under Delaware law. And the reason— So no one would get to sue, right? You're just saying— So even though— There's no violation. There's no violation. There's no contract under Delaware law. If the dividend is in the securities of the issuing company, there is no binding promise made at the announcement of the dividend or of the record date. That's black-letter law that we go through in some detail. So in this case, you know, you did everything. You announced the record date and the distribution date. But you distributed all of the spinoff shares, I don't know, just to like, you know, three guys who are insiders of the corporation. That's fine because you never promised anybody the spinoff shares? Well, no, Your Honor. That's not fine. But as I said earlier— Why is it fine, though? Well, let's say they have 99 other shareholders, right? The 99 other shareholders could come in with a breach of fiduciary duty or some kind of fraud. You just said it's not a binding promise. So they don't get to say, I'm entitled to spinoff shares. You just said, like, it's just arbitrary. They announced spinoff distribution, and you're saying that doesn't bind the company. They don't have to deliver on it. They could do it in an arbitrary fashion. Nobody gets to sue over it. Well, Your Honor, that's not what I'm saying. I'm not saying just because that one promise doesn't exist doesn't mean that all of the Delaware corporate law flies away and you can just do anything else you want. So what is the violation and who gets to sue? In your hypothetical? Yeah. In the hypothetical, it's in this case, right? So let's say taking the allegations is true. There's a record date. There's a distribution. They distribute not based on the record date. Somebody who was a record date shareholder doesn't get the spinoff shares. You're saying that person doesn't get to sue because it wasn't a binding promise. But you seem to agree that there would be malfeasance in that scenario. So who gets to sue and what is the violation? Well, Your Honor, maybe I was unclear. I'm not saying there's any malfeasance in the scenario that actually happened in 2023. What I'm saying is in your hypothetical, if Jupiter has some number of shares and announces a spinoff but then only just picks three insiders it likes and gives everything to them. Well, how do you know that's not what happened here? I have trouble understanding, frankly, what did happen here because what is the point of setting a record date and then you get to the time for the actual distribution and you do not honor the record date. I don't understand what possible rationale that could have. And one possible rationale for all I know, because there's nothing in the complaint, nothing in the record before us, tells us who Savvy is really and what the relationship is that they had with Jupiter and whether there was some reason that Jupiter thought that Savvy had stabbed them in the back by selling their shares or God knows what. I mean, what would be the possible motivation other than perhaps negligence, as is alleged in one of the counts of the complaint? Why wouldn't you honor the record date? Well, a couple of reasons, Your Honor. One, I'll say as far as the complaints, I agree with you that we really don't get a lot of the who, what, where, what happened. We don't know when Savvy bought. We don't know when Savvy sold. We don't know.  And he doesn't know why you decided to screw him. Well, I don't know that. You, presumably, your client does know. Now, we can't ask you about it because it's outside the record. Right. But it's a little annoying to say, well, it's not in the complaint, so we don't know. It's not in the complaint because he doesn't know either. But it's very mysterious to me, right? What would be the point of setting a record date at all rather than saying we're going to distribute this property when the transaction happens to whoever's around when the transaction happens? Why? Why say we set a record date of this, which is the normal corporate practice for normal dividends? And everybody knows what to expect from that. But you're saying, well, this is different. OK, well, if it's different, why didn't you act like it was different? Well, I think we did, Your Honor. I'll point to two things, regardless of whatever's outside the record. Right? If we look at the amended complaint itself, paragraph 21, Sabby writes, and I quote, the sole reason for the delay in distribution of the SRM dividend involved the timing of IPO, et cetera. Right? And Sabby is saying, well, OK, whatever the distribution date is has to necessarily be different from the record date for all the reasons we've been talking about this morning. Right. If we go back to the actual press release that Sabby alleges it relied upon in January or excuse me, which is June 27th, 2023, in the appendix, that's pages 72 and 73. Right. If we look at the first paragraph of the presser, it says, Jupiter today announced that the record date for the spinoff and distribution of shares of common stock. Right. So first of all, in that first paragraph, taking words and documents as they come, how it's phrased is record date for the spinoff and distribution of shares. Will both be the same. Would both be the same. And I'll pause there for a second. I'm sorry. That's just not true. The record date for the spinoff and distribution of shares. So the record date for the spinoff and distribution of shares has been set for July 7th. Yeah, it doesn't say the record date and the date for the distribution of shares. Just the record date for those events. Sure. Spinoff and distribution of shares. Yes, Your Honor. I'll pause there. And the only thing I was going to say is, who knows if a lawyer wrote, who knows who wrote this thing, right? So we're not going to read it maybe with the same tightness that you'd like to read a contract. Wait a minute. You're just pointing us to this language. Well, I'm going to keep going on the other language. In fact, the press release says, Jupiter today announced that the record date for the spinoff and distribution of shares of common stock. Yes. Has been set for July 7th, 2023. Yes, Your Honor. Two paragraphs later, it says the distribution is expected to be paid on July 12th. Be paid on July 12th, which is a different date. So it seems like you have a definite record date and a tentative distribution date. Well, if you go on, as Your Honor has pointed out earlier, if there was never a spinoff at all, there would be no record date. There would be no distribution, right? That wouldn't make any sense. And those are some of the potential obstacles that this press release goes on to warn about, including in that paragraph. Yeah, but that's not what happened. In other words, it seems to me that if what happened was that the transaction never took place and there never was a distribution, then Mr. Fleming's client would be out of luck because he was told that was a risk. That's what actually came to pass. There's no point. The record date becomes irrelevant because it's the record date as of which people who were shareholders on that date will benefit from the distribution. But he's been warned that the distribution may never occur at all. He hasn't been warned that the distribution date could be changed or not honored. The record date. I'm sorry. The record date has been. And there's a difference here between a very classic for securities kinds of situations between future looking things and past looking things. Right. The distribution is expected to be paid. Right. About July 12th is a future looking statement. That's what we expect. May not happen. May get adjourned. May never happen. Right. The record date when it does happen has been set. I mean, when I first looked at this case, frankly, I thought, oh, well, you're just relying on it. It's fine. Fine. Fine. Just relying on a press release. That's just that's just a thing. It's not a promise. But it isn't a promise. It's a representation of fact. Right. We don't know whether it's a true representation or an inaccurate one or a false one. But I think the reasonable person reading this thinks the board of directors passed a resolution saying this is what the record date is going to be. And that happened. Has been set. Okay. Okay. So I'm just having I'm still having trouble understanding why there's anything here that warns that that record date might not be honored. Or any reason under Delaware law why it might not be honored. Well, a couple of things, Your Honor. I think under Delaware law is going back to those first principles that I spoke about earlier as far as distinguishing very much between the idea of the capital, the stock of the entity versus its surplus. And I think actually that this press release really ties right into that established Delaware precedent. Right. Because the rationale between behind why Delaware distinguishes between this idea of dividend from profit versus stock of the corporation, in the Delaware cases that we cite in our briefs, go through that a lot of the policy underlying that is because spinoffs, distributions, and corporate mergers, transactions, whatever, are so speculative is not the right word, but they're subject to change. The things happen all the time. You all have seen that many, many times. And why is a record date? The record date, if you are correct, is a meaningless statement. It should never have happened. There's no such thing as a record date because this is not the kind of transaction for which a record date matters. I don't know the answer to that, Your Honor. But I will say to the extent that count one is a breach of contract claim, there is nothing in the bylaws that prevents the company from changing the record date. And there's no allegation. I understand. You make the argument that you change the record date. But it seems like your argument doesn't require you to change the record date at all because you're saying the record date is not a promise. And you don't need to honor it. You could have, in fact, sent everybody a personalized communication that says, I want to assure you the record date is July 7, 2023. But then you could just turn around and make it a different date and it wouldn't matter because it's not a binding promise. That's your position. Well, in the position, not quite. In the capital stock position that we've been talking about, that's obviously one big distinguishing factor. I think another distinguishing factor actually is Distinguishing from what? From whether or not it's a binding promise. And then as far as the negligence-based claims are concerned, you know, we talk, the case law discusses that a press release or any public statement standing alone couldn't be the base of that promise. What it could be is, and to get to Your Honor's point, is if there were individual communications saying, picking up the phone, hey, Sabby, you know, we've worked together so long. We know you guys are doing all these things. And we want you to know that you personally, we're going to take care of you on this date. The case law says that those are very different promises that one could rely upon in a promissory estoppel or a negligence representation. But you're just saying the nature of this transaction, the spinoff transaction, is such that Delaware law considers it as a matter of law not to be a binding promise. Yes. So it wouldn't really matter what representations you made, right? Because you're just saying that, you know, this is just a thing we talk about. But, like, you know, Delaware law says it's never binding. In this particular case. It's never possible to argue that we breached a promise about a record date for a spinoff transaction. Yes. Okay. Any sense in asking the Delaware Supreme Court to figure this out? I mean, this is all about Delaware law, I suppose. Yeah. I mean, that might be it, you know, Your Honor. I think it is notable maybe in both directions. I didn't find a single case that looks exactly like this one or, frankly, in my opinion, even close to that one. I don't think Sabi did either. It's a novel situation. And there might be worth asking Delaware. Why do you say it's a novel situation? You began this argument by saying Delaware law is very clear that this is not a binding promise. Right. So, like, how can it be that there's no case on point, but it's also very clear under Delaware law? Well, I think because there's no case, because Delaware law is so clear, you've never had a short seller suing an issuer to try to recover damages for losing his bet against the issuer. Forget about the short sale.  Like, just about the – if a record date holder didn't get the spinoff shares, you know, your position is regardless of whether there was a short sale. Right. Like, it's not entitled to the spinoff shares because a spinoff transaction is never binding on the company. Yes. Okay. All right. Thank you very much. Thank you. Ms. Parks, we'll turn back to Mr. Clement on rebuttal. Yes, Your Honor. I'd like to weigh in first on the possibility of sending it to Delaware. I would respectfully request that the Court not do that, in part because the amount involved here is approximately a million dollars, and the cost of litigating down there will just add to the damages and the toll that it takes in delayed justice here. And I would also point out that we're here while they keep saying these bylaws are not a contract, not binding, et cetera. We're here because the bylaws require us to be here. It's the company's bylaw that made New York the exclusive forum for resolving issues of Delaware law. So I would respectfully request that we stay here in New York and we'll accept whatever decision – So the bylaws actually require the application of Delaware law as interpreted by the federal courts of New York. Correct, Your Honor. The Delaware – there are many lawyers who are not anxious to have their cases resolved in Delaware for a whole variety of reasons, and this is one where the company and the bylaws put an exclusive forum clause of New York. You also sometimes see them in California. They like it out there, too. In this case, New York – Can I ask you just to address this question? Ms. Park says – Delaware says there are property, cash, and stock dividends, and property and cash dividends are only from the surplus of the company. And so if you're spitting off a subsidiary, it's a stock dividend. That was my second point, Your Honor. So there are – this record held this was a spinoff dividend. There is no such thing as a spinoff dividend, first. Second, this is not a spinoff. The cases tell you that a spinoff is when a company issues 100 percent of the subsidiary so that the shareholders own interest in two companies as opposed to a parent and a sub. In this case, they sold or transferred a small portion of the shares, recapitalized the company, so it's not a spinoff. But more important, the statute in Delaware and corporate law is very big on the statute. The statute says it – you should follow it – says there are three types of dividends, cash, property, and the shares of capital stock of the corporation. This is clearly not shares of the capital stock of the corporation. That would be the common stock of Jupiter Wellness. And we've cited the court Chancellor Lamb's decision in IAC Interactive, and Chancellor Lamb does a spectacular job of working his way through the Delaware court's discussion of stock dividends, in which the term is used sort of interchangeably with shares of a subsidiary and shares of a parent corporation. And he explains that stock dividend is a term of art, meaning a share split, shares of the corporation, and shares of a subsidiary are really a property dividend. There are three types of dividends under Delaware general corporation law 173. Correct. In Delaware statutory terms, a spinoff is a dividend paid in the property of the parent corporation, not a sale of its securities. Correct. That's – and the – But Ms. Fars was saying, well, even if, you know, you're selling off the property of the corporation, if it's not part of the surplus of the corporation, the shareholder is really in the same place and it shouldn't be regarded as a binding promise. What about that argument? I don't think – first of all, it's property. You're not in the same place because you have different owners and you have a different asset. And in the case Your Honor gave where they distributed a factory, they would distribute it out as tenants in common. And you might see a small corporation with 50 shareholders do such a thing. But the shareholders would have property and the corporation would be diminished. The issue is, is the corporation diminished and is your share of stock in the company worth less? And that's what this – that's what happened here. The share of stock was worth less. Why is it that that is – so it's a change in the – in the composition of the company that is dispositive as to whether it's a binding promise? Why is that a dispositive thing? Part because the – well, it's largely because, and I think this is addressed in IAC Interactive, that you're – the company said it's going to split. If you don't get the shares, you're really not losing anything. So on the failure to deliver a share split, you still own your basic interest in the company. Your pro-rata interest in the company is maintained. Whereas with property and cash, obviously, the company is diminished. Right. So if the company just wants to do a split and everybody ends up having the same ownership stake in the company, they're not – nothing's really changing. And if the company – If they fail to deliver the split. And the hypothetical the court has asked, which is, okay, let's say the company declares a dividend and doesn't go through with it. In the case of a share split, you're still in the same position. And that's why it's not binding. So if the company spins off a subsidiary or, as you say, spins off some ownership of the subsidiary, then the people who own the shares of the parent company are not in the same position. Correct. They're diminished. And in this case, it was an interest 2 million shares of a subsidiary that was to be spun off. And it's really a question of you've got to put it into one of three buckets, cash, property, or capital stock of the corporation. And by process of elimination, it has to be property. And there's really no reason to distinguish cash from property. The Delaware courts and I think even the district court agreed that a dividend of cash would be binding. There's really no reason that a dividend of property would be any different. If I've answered the court's questions, I would ask the court to reverse the district court and arrest my case. Okay. Thank you very much. Thank you. Mr. Clemming, the case is submitted.